# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

## James T. and Albert Hamilton, trading as J. T. & A. Hamilton, v. The Pittsburg, Bessemer and Lake Erie Railroad Company, Appellant.

*Railroads—Eminent domain—Right of the commonwealth—Instructions.*

In a proceeding to assess damages for land condemned by a railroad company, where it appears that a prejudice exists in the community against the railroad company for taking the land, failure of the trial judge to instruct the jury that all land is held subject to the right of eminent domain, and that a railroad company, in exercising this right as the representative of the commonwealth, is guilty of no usurpation of power, is ground for reversal, but a charge which is in substantial accord with the rulings of the Supreme Court, and merely lacks clearness in one or two particulars, will be sustained.

*Evidence—Incompetent answers to questions—Trial—Motion to strike out testimony.*

Where certain answers of witnesses are competent, and other answers are incompetent, the court will not, on motion, strike out all the testimony of the witnesses. The motion should include only those answers which are erroneous.

*Evidence—Trial—Request for instructions.*

The Supreme Court will not assume that a trial judge erred in omitting to give more specific instructions on the evidence than he did give, if it appears that no request was made to him to give such instructions.

Argued Oct. 18, 1899. Appeal, No. 147, Oct. T., 1899, by defendant, from judgment of C. P. Butler Co., Sept. T., 1897,

No. 24, on verdict for plaintiffs. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL, DEAN, FELL and BROWN, JJ. Affirmed.

Appeal from jury of view. Before GREER, P. J.

The facts appear by the charge of the trial court and by the report of the case in 190 Pa. 51.

At the trial J. T. Hamilton, one of the plaintiffs, testified as follows:

"Q. Were there any other features than the frontage on the railroad and being a square that made it specially valuable? A. There was a dumping ground for our refuse, which made it valuable. Q. Did it offer facilities for enlargement or improvement?"

Objected to as incompetent. It is an attempt on part of the plaintiffs to introduce speculative ideas as to values. The test is, what was the value of this property immediately before entry by the railroad company and what was its value afterwards for any purpose.

The Court: We will receive it. Bill of exceptions sealed at request of defendant's counsel.

"A. This was one of the inducements to purchase the property."

Mr. McQuistion, counsel for defendant: I move to strike that testimony out as incompetent and irrelevant. It is not a question what his purpose was in buying this property.

The Court: We will not strike it out now. Bill of exceptions sealed for defendant.

"Q. You may state whether or not that feature of the property has in any way been interfered with by the construction of the Bessemer railroad. A. It has."

Objected to until the purpose is shown.

"Q. What feature does he refer to?"

Mr. Galbreath, of counsel for plaintiffs: The purpose is to show how the property has been affected by the construction of this road, and the feature referred to is the capacity and adaption of the property for the enlagement and improvement of their works.

Mr. McQuistion: Objected to as incompetent, because it has already been shown that the bottling plant works are not in any

way interfered with by the railroad company; that the buildings stand there untouched, and in no way interfered with on part of the railroad company, and damages cannot be assessed on the theory that injury has been done to the bottling plant; that is not interfered with. At most all done on the part of the railroad company was to take and occupy half an acre of unoccupied land; and enlargement of the works is not an element of damages in this case. The test in this case is, what was the value of that entire property at the time it was invaded by the railroad company, and what was its value immediately after, and it is immaterial as to what the witness on the stand intended to do with the property.

The Court: The question for determination is as to the diminution of the property from what it was before the taking, and what it was after the taking; this question is asked for the purpose of showing market value of the property; it strikes me it would be competent for that purpose, and we will receive it. Bill of exceptions sealed for defendant. [16]

" Q. I will now ask you what facilities that lot afforded at the time of the construction of this railroad, for improvement and extension of the business."

Objected to as incompetent; the question is what was the actual market value of the property for any purpose at the time of the appropriation.

The Court : I think we will receive that. Bill of exceptions sealed for defendant. [19]

" Q. You may state whether or not your property located as it was when the railroad was built, since building the road, affords facilities for enlargement on the north side."

Objected to as incompetent. It is an attempt to introduce speculative ideas that some time in the future he might build.

The Court: The question is as to its depreciation in value. I think we will receive this. Bill of exceptions sealed for defendant. [20]

Albert Hamilton, one of the plaintiffs, testified as follows :

" Q. What facilities do these separate portions offer since the construction of this road for improvement or enlargement ? "

Objected to as incompetent and irrelevant.

The Court: We will receive it. Bill of exceptions sealed for defendant.

"Q. Will you state what was the fair market value of your property at the time of the construction of this road in August, 1896? A. Seventy-five thousand dollars. Q. Will you state what was the fair market value of the property immediately after the construction of the road and as affected by it? A. We would have been glad to have taken $45,000."

Cross-examination:

"Q. It was unoccupied ground? A. There were no buildings on it. Q. You were not making any particular use of it at that time? A. No, sir. Q. The railroad company has not invaded any building of the plant? A. No, sir. Q. It has not diminished the productive power of the plant? A. No, sir. Q. You are making just as many bottles there now as before the railroad went through, or could make them? A. Yes, sir. Q. You are not deprived of a crossing in going over? A. We have not been yet. Q. You think the property has been depreciated in your opinion $30,000? A. Yes, sir. Q. In making up this opinion of yours as to the damage, you have taken into consideration the fact that you are deprived from building thereon? A. Yes, sir. Q. And taking into consideration your property has been injured by fire? A. Yes, sir. Q. And taking into consideration that you are deprived of the future enlargement of your plant? A. Yes, sir. Q. I am asking you how much damages do you claim in this opinion of yours, to wit: $30,000, for being deprived of the future enlargement of the plant on that unoccupied ground? A. I think that would be $15,000. Q. How much damages for being deprived of the unoccupied ground? You say $15,000 is one item; what other items enter the damages? A. The unsalability of the property if we would offer it. Q. How much for that? A. Fifteen thousand dollars. Q. How do you make up the balance? A. We have lumped our damages; the extra cost of building on the east and managing two plants; the increased cost of running two plants; the increased cost of running two plants on two sites instead of one. Q. How much do you allow for that? A. That was in my estimate. Q. How do you make up the other $15,000? A. For the loss of frontage on the Pennsylvania railroad. Q. How much do you claim for that? A. We figure that at about $50.00 a foot front, which would be about $6,000. Q. How do you make up the balance of $9,000? A. General inconvenience;

you might say, the inconvenience of having two separate glass houses." [21]

Mr. McQuistion: Defendant moves the court to strike out the entire testimony of Albert Hamilton, as speculative, in that he bases his estimate of the damage sustained, to wit: $30,000; on being deprived of the future enlargement of the plant on the unoccupied ground $15,000, and $6,000 for being deprived of the frontage on the Pennsylvania railroad, and $9,000 for the inconvenience of operating the plants when enlarged.

The Court: We will refuse the motion. The use for which it is being used is certainly an element in the case. Bill of exceptions sealed for defendant. [22]

L. P. Walker, a witness for plaintiffs, testified as follows:

"Q. Do you have knowledge of the value of this property in dollars and cents as a glass plant? A. No, sir. Q. At the time of the occupation of this land by the railroad company in August, 1896, what was this property as a whole most valuable for? A. For a manufacturing establishment. Q. And what amount would you say, of the market value, has been decreased by reason of the construction of the road? A. One is, increased danger by fire, and another, the frontage on the West Penn, and cutting off part of the plant; they could never increase without passing and repassing under the road. Q. And in addition would you add the land actually occupied by the company? A. Yes, sir."

Cross-examination:

"Q. If the plant is not touched; its buildings not in any way impaired, and making just as many bottles with the railroad track there as before; then you would not say that the plant of itself is damaged? A. I understand it is not impaired except from danger from fire. Q. That danger from fire can be very easily remedied? A. Yes, sir, by spending money. Q. By an iron roof? A. Yes, sir. Q. Now then, what would you say the unoccupied land prior to the appropriation per acre was worth in August, 1896? A. I could not say. Q. The danger of fire it only a possibility? A. Yes, sir. Q. If there never would be any fire then your whole theory would be wrong? A. There is danger by fire every time a train goes by. Q. The damage the fire might do the property, you don't know? A. No, I don't know how far it would go. Q. How much do you

attribute to danger by fire in that damage of that twenty-five per cent in dollars and cents? A. At least one third of that percentage would be on account of fire. Q. How much would you attribute for frontage? A. Ten per cent. Q. That was not occupied at the time the railroad was laid out? A. They possibly would have increased their plant. Q. If they didn't occupy it then you would be wrong? A. It would not be so valuable. Q. That is only a paper roof? A. Yes, sir. Q. Where do you make up your balance? A. The ground cut away and depriving them of the extension of their plant. Q. What did you attribute for being deprived of the future enlargement of their plant? A. At that same rate, it would be ten per cent. Q. Then if you never build another plant, there would be no ten per cent in that? A. It has deprived him of the privilege. Q. Couldn't he build another plant there if he wanted to? A. Yes, sir. Q. Just as much and have more frontage on the Pittsburg and Western? A. Yes, sir. Q. Your estimate of twenty-five per cent is based upon the possibility of fire some time in the future and of being deprived of the future enlargement of the plant if he should desire to build one, and being deprived of the frontage? A. Yes, sir. Q. If he ever wanted to build there? A. He might use it if he didn't want to build there."

Mr. McQuistion : Defendant moves the court to strike out the testimony of the witness as incompetent and irrelevant, being speculative, for the following reasons : (1) Because the witness bases his estimate of the damage sustained upon the probability that the plaintiff will, some time in the future, enlarge his plant on the unoccupied ground on the east side of the right of way; (2) because he bases his estimate of the damage in part on the possibility of a fire some time in the future; (3) because the plaintiff has been deprived of the few feet of frontage that was unoccupied at the time of the appropriation by the railroad, and for the further reason that he does not give the market value of the land taken; hence the testimony is incompetent, speculative and contingent, and for those reasons should be stricken from the record.

The Court: We refuse the motion. Bill of exceptions sealed. [24]

The court also refused to strike out the testimony of W. F.

Rumberger, Joseph Hartman and W. J. McKee, which was of a similar nature to that of L. P. Walker. [25–27]

The court charged as follows:

This is an action of the plaintiffs, James T. and Albert Hamilton, owners of about four acres of land situate in Butler borough, on which there is a plant for the manufacturing of bottles, against the Pittsburg, Bessemer & Lake Erie Railroad Company, to recover damages on account of the taking and appropriating by the said railroad company defendant of about half an acre of said land. The entire lot of the plaintiffs is bounded on the north by the West Penn railroad, and on the south by the Pittsburg and Western railroad, with a frontage on the West Penn railroad of 506 feet, where its furnaces, warehouses and buildings are located. The piece of ground taken is forty-five feet wide and 448 feet long at one side, and 516 feet at the other side. It runs diagonally through the plaintiffs' land, starting at or near the southwest corner and coming out at the northeast corner, where it takes about sixty-four feet of the frontage on the West Penn railroad. It cuts the land in two pieces, one piece on which the bottle plant is located contains one and fifty-nine one hundredths acres, and the other on which there are no buildings containing one and ninety-three one hundredths acres, leaving the latter piece without any frontage on the West Penn railroad. It does not touch any of the plaintiffs' buildings, but runs within six or eight feet of their warehouse, and leaves the piece on the west side, where the buildings are, in a wedge shape, with but little ground in the rear of the buildings.

This appropriation was made in August, 1896, and the defendant company now has its road constructed and is running cars over it from Pittsburg to Erie. The road through the plaintiffs' land is on steel trestles about thirty feet from the ground. The defendant company takes this land under the right of eminent domain, a right reserved by our state in the conveyance of land originally to the inhabitants; that is, a right to retake it in case it is needed for public improvements, and every one who holds lands in Pennsylvania holds it upon this implied condition, but the constitution of the state, however, requires that when land is so taken fair and just compensation shall be made to the owner thereof by the state or its agent taking it.

The plaintiffs and the defendant company have not been able to settle this question of compensation themselves, and the matter has come into court for a legal determination and settlement by a jury. The plaintiffs allege that on the account of the taking of this land and the way it was taken, with a railroad built thereon and in active operation, they are injured to the extent of $30,000; that the market value of their property was $75,000 before it was taken; that it was not worth more than $45,000 after taken, and their damages should be the difference between these two amounts, $30,000.

The defendant company does not dispute the plaintiffs' right to compensation for their injuries and land taken, but disputes the amount claimed, so your duty is to determine the amount the defendant company should pay them. The law has laid down a rule that the measure of damages in a case like this is the difference between the market value of the whole property invaded, for any purpose, as unaffected by and immediately before the construction of the railroad and its market value for any purpose immediately after, and as affected by such construction. The burden of proof is upon the plaintiffs to show the amount of their damages. This they must do by the preponderance of the evidence, and from the evidence you must determine the amount of damages and make your verdict accordingly. [Then the first question for you to consider is, what was the market value of the property as a whole immediately before, and what it was immediately after, the taking and as affected by it. James T. and Albert Hamilton both testify that its market value was $75,000 before it was taken in August, 1896, and that the whole property after this was not worth more than $45,000, therefore their injuries under the rule of law for the determination of such damages, if they are correct, are $30,000. They are the only witnesses on part of the plaintiffs who attempt to fix the value, either before or after. A number of other witnesses are called, who state they have no knowledge of the value of such a glass plant, and are unable to give an estimate in that respect, but say they have knowledge of the market value of real estate in the vicinity of this property, and they fix the decrease in value at from twenty to thirty per cent of the market value. You will recollect the several witnesses and their testimony, therefore, I

will not name them or repeat their statements. You were upon the ground and have personally examined it, and the buildings thereon; you have heard descriptions of the property, testimony as to the adaptability of the land for the purposes for which it is used. Peculiar adaptability to some particular use is an element which may very materially increase the market value of land, and this fact will be carefully considered, but not so far as any speculative element may appear. You will carefully consider every element in the case which will shed light on the true market value of the land at the time of taking, what circumstances, facts or elements would come into the mind of a person contemplating the purchase of this piece of ground as a whole before the land was taken, and what would he consider after he had knowledge of the appropriation for the purpose of constructing the railroad, after constructed and in operation. He would properly consider the amount of land taken, how and where taken, the disadvantages on account of its being taken, the disadvantages, if any, of the land being cut in two, the risks from fire incident to the lawful operation of the road, and as to this there are two theories upon which the claimant for damages can properly argue, such risk is material evidence in his favor. First, he can claim the danger is so imminent that no man of common prudence would maintain his building in such close proximity to the railroad. In that case he is entitled to the cost of removal of his building and its reconstruction in a safe place. Second, if the danger is not great, either from the fireproof character of the structure or its distance from the railroad, yet it can still be said there is some risk from fire by reason of the lawful operation of the road; he can claim that that fact depreciates the market value of the land entered upon; in the first case it is the loss of the improvement, in the second a disadvantage in the use. Damages in this regard cannot be assessed or recovered in this proceeding as a distinct, separate and independent item of damages that may accrue from fire: it can only be considered in so far as it would detract from or depreciate the market value of the property. Risks of loss by fire on account of careless and negligent operation of the trains and engines on the road cannot be here considered; this is the subject of an action when the loss occurs.] [10]

[The defendant company in taking this ground has the right, should it at any time desire, to make a fill where its trestles now stand, and in such case the plaintiffs can get no additional damages, unless it takes more land. Should it do so the law will require it to provide a crossing at some point for the plaintiffs to pass over or under from one piece to the other.] [15]

[You will carefully consider the situation and shape of the ground as left by the defendant company, the advantages or disadvantages it may give the plaintiffs in operating, using, maintaining or enlarging their glass plant; this is an element in determining the market value which you have a right to consider, but you cannot consider profits which might be made by an enlargement of the plant, as that would be speculative and improper.] [11]   You have a right also to consider the special benefit the road is or will be to the land. [This kind of a case differs a little from other damage cases ; it is not possible for either side to furnish witnesses who can make a correct estimate of the damage only so far as the real value of the land taken is concerned. Where there is a dispute as to coal or timber an estimate can be made of the amount of coal taken or timber taken, and a calculation made from the facts, but in this case, gentlemen, you will have to determine very largely from your own judgment and your own opinion, and from the judgment and opinion of witnesses who have testified in the case. These witnesses who testified here are not testifying as to facts, but when they give their estimates they give them upon their judgment, upon acquaintance with the land, upon their knowledge of values in the neighborhood, and upon their knowledge of the value of property and the business for which it is being used. You will notice, gentlemen, that there is a very great difference in opinions of witnesses; we have heard on part of the plaintiff two witnesses who testify that the depreciation of this property is $30,000; we have had a dozen witnesses, perhaps more, who testify that they cannot give to you the real value of this property ; that they have not such knowledge of the value of the glass property as will warrant them in making an estimate, but they state from their knowledge of property in the vicinity that they believe it has been depreciated, some say twenty, some say twenty to thirty, and some twenty-five to thirty per cent; you have the difference in opinion, because men differ.] [12]

On behalf of the defendant in this case it offered some sixteen or seventeen witnesses; a large number, I think, twelve or thirteen, fix the damages at a lower rate, I think the highest $3,000; Mr. Tracy puts the damages at the lowest; he says $800; J. Q. A. Kennedy, a citizen in the town, says he considers the damages to the glass company the value of the land and whatever it would take to put up an iron roof and siding on the building next to it, and he puts the value of the land at $900 per acre. You have this difference; we say to you that we have every reason to believe that each of these witnesses has been honest in his judgment and in his opinion as given you, but men's opinions and judgments differ.

[Now, gentlemen, you have been taken upon the ground and your opinion in this case, as far as you have knowledge, is recognized as good and safe as any other one whose knowledge is not greater as to values and circumstances, and the testimony of witnesses, who may be in this respect called expert witnesses, is only to aid you in coming to a conclusion; you saw the property; you have a statement as to the amount of ground taken and you saw the buildings; you have a statement as to the situation and convenience and so on; you saw where the railroad company has constructed its trestle work and running cars and have knowledge of the division of the land and have testimony as to the amounts of ground contained in each piece, and have testimony as to the use of the ground by the plaintiffs, and have also testimony as to what ground is needed and necessary to the plaintiffs in the maintenance and keeping up of their business; you take all that and come to a conclusion as near as you can as to what was the real value of this property before it was taken in August, 1896,] [13] then you come next to consider what was its value after the railroad company had taken and constructed its road, the market value, I mean; what the property is worth in the open market where all can bid on it.

[The plaintiffs claim that this land has been greatly depreciated; one reason given is that it divides the land and makes it inconvenient and leaves the amount for buildings too small; another reason is that it has taken away part of the frontage on the West Penn railroad; another reason is that the piece cut off has no frontage on the West Penn railroad; another

reason is that there is danger or risk of fire, all reasons spoken of by most of the witnesses in their testimony.   Now these matters have been mentioned by these witnesses; the first thing, gentlemen, for you to consider is, how much do these witnesses know about what they are testifying; what knowledge have they?   You have a right to weigh the testimony of each witness and consider whether or not he has knowledge; you have a right to consider whether or not he is able to make an estimate that would be fair and just and right, and you have a right to consider whether or not the witness would be influenced in any way.

Before the act allowing parties to testify a party could not testify in his own behalf, but the law permits them to testify and it is right they should ; it is your duty in considering their testimony to consider their knowledge ; are they interested in your verdict?   Would that interest influence them in their testimony?   When you consider the rest of their witnesses, you have a right to consider what knowledge they have and consider whether a witness who testifies that he does not know the value of the property, whether or not he is a qualified witness to determine the amount of depreciation.   The law allows us to admit them, but leaves to you the duty of weighing their testimony and considering whether or not the fact that they do not know the value of the property, whether they would in that event be competent to determine how much the depreciation is.   Now, gentlemen, take all these things ; so far as fire is concerned, you cannot consider that as a separate item of depreciation or separate item of damages ; you can only consider what effect that would have upon a purchaser were he contemplating the purchase of this property as a whole ; what would a reasonably intelligent purchaser who has knowledge of the business and has knowledge of the running of railroad trains reduce the value of the property on account of the engines passing over and along as it passes here?   Now, gentlemen, in the consideration you would only have a right to consider what damages occurred and accidents took place from the careful operation of the railroad ; if the workmen on the train were negligent and threw out fire and sparks when they should not do it, or if the railroad company was negligent and did not put on good, safe spark arresters and sparks came out on that

account and burned the buildings, the owners here could then collect for that negligence and for that loss in an action brought then, therefore, on that account, you cannot consider in this case the damage that would occur from negligence on the part of the railroad company; only such damage as will occur when the railroad company has put on the proper appliances, and when the workmen on the railroad have used due diligence and care in operating the engines and road. You will have to determine this question of fire from your own knowledge and judgment and reason as to what is likely to occur if the railroad company does what it ought to do.] [14] Another question; you have a right to consider the disadvantage, if any, that the plaintiffs will suffer on account of the road cutting through the land as it does; you have a right to consider the advantage the railroad is to the land; it would not do for you to say that the railroad company gives no special advantage to the plaintiffs; that is a fact for you to consider from the testimony; if these plaintiffs have no special benefit from this railroad over and against what their neighbors have, then consider that fact.

Now, gentlemen, you will appreciate that this is an important case, and you will take the evidence by both parties here for what you honestly consider it worth; you will take into mind the buildings as you saw them and as they are described to you, and carefully sit down as auditors, as you have only one duty to perform, and that is to fix the amount of damages, and make an honest audit between the plaintiffs and defendant and return a verdict accordingly. You will allow no prejudice to interfere with you; try this case exactly as between two neighbors or two men you never saw; make an honest effort, if you can, to get at the value of the buildings and the depreciation of the value, giving to the plaintiffs a full, just and fair compensation for the damages they have suffered, and you will give to the defendant company every fair consideration, every fair advantage and make out your verdict fairly and justly and honestly; allow no prejudice, allow no feeling, allow nothing to interfere with you. You sit here as judges of the facts; you occupy an important position; here are two important companies unable to agree; you are called in as disinterested persons, as discreet persons; you have seen the grounds and heard

the charge of the court as to the law and the argument of the different parties as to the facts, and it is now for you, under your oaths as men, to carefully sit down in your jury room and give the case such a careful, fair, unprejudiced examination as will be fair and just to both parties. The plaintiffs here have their land taken; the law recognizes they must have just compensation. The defendant company says it is willing to give just compensation; it is not contending that it ought not to pay compensation, but there is a difference as to the amount of that compensation; and they have brought together all the facts and surroundings and laid them before you, and it is for you to take them up and decide them as between two brothers.

Verdict and judgment for plaintiff for $10,800. Defendant appealed.

*Errors assigned* among others were (10–15) above instructions, quoting them; (16, 19–22, 24, 25–27) rulings on evidence, quoting the bill of exceptions.

*Lev. McQuistion*, for appellant.

*J. M. Galbreath*, with him *Clarence Walker*, for appellee.

OPINION BY MR. JUSTICE DEAN, December 30, 1899:

All the material facts in this case are to be found in appeal by same defendant reported in 190 Pa. 51. We find nothing in the assignments of error calling for special notice, except those from the tenth to fifteenth inclusive, alleging inadequacy and unfairness in the general charge of the court; and the sixteenth, nineteenth, twentieth and twenty-first, alleging error in the admission of incompetent testimony and instruction to the jury on the effect of it.

As to the charge, we cannot say as matter of law it was erroneous, inadequate or partial. We concede, as we must do from our judicial observation in very many cases, that generally, there exists, especially against carrying corporations, an unreasoning prejudice which often results in injustice to them, and that it is the duty of trial courts to combat such prejudice and reach judgments uninfluenced by it. The right of eminent

domain is in the commonwealth, to be exercised for the public benefit when she so wills; when she does so will, there is no arbitrary usurpation of power, but merely an assertion of an unquestioned right of sovereignty in the interests of the public as a whole.    Every man who buys a foot of land knows or ought to know, that he takes it subject to this dominant right; it may be taken from him any day; the interests of the whole public are superior to his undisturbed enjoyment of his individual ownership.    All the owner can ask is compensation; not that he shall be made rich but that he shall be made whole.    The owner, too often forgetting this real relation between himself and the commonwealth of which he is a citizen, feels outraged by what he deems a violation of his right of property when the clear right is on the other side, and we see at times whole communities sharing in the indignation of the supposed injured owner; imbibing with him prejudice against the commonwealth's grantee, and willing, not only to make the owner whole, but also glad to punish the taker by imposing excessive damages for the exercise of an undoubted right.    This prejudice, as argued by appellant, perhaps existed in this case, and may have influenced the verdict; but the learned judge of the court below seems to have fairly tried by proper rulings and instructions to counteract it.    If it were manifest that he failed in duty in this particular, we would, without hesitation, reverse for that reason alone. The most we can say is that perhaps in one or two particulars the charge lacks in clearness; but on the whole it is in substantial accord with the opinion rendered by us on the former appeal.    Therefore we do not sustain the assignments of error relating to the charge.

As to the errors complained of in the admission of the testimony of Albert Hamilton and the other witnesses, a number of the answers were incompetent and some irrelevant.    In several instances they were not in response to the questions asked. The court sustained some objections to answers and overruled others, and struggled to limit the admissions to that only which was competent.    If, as seems to have been claimed by plaintiffs in their testimony, the packing house, by reason of the combustible material, was a tinder box, within six feet of passing locomotives, then their claim for damages should have been strictly limited to the cost of rendering the building fireproof or to

cost of removal.  The defendant had a right to insist on plaintiffs disclosing fully and clearly the exact purpose of the offer; if this purpose had been to show that no prudent man would maintain buildings in such peril, then plaintiffs' damage would have been the expense of rendering them fireproof or relocating them.  If the danger was no greater than the ordinary one the risk could only be considered as one which might or might not depreciate the market value of the property.  The court had no aid from defendant's counsel in compelling a specific offer, and consequently some of its rulings on objections appear inconsistent; but when we consider that the testimony for one purpose might not have been admissible for the other, it is not surprising that error is now alleged.  But to cure alleged error which the court tried as best it could to prevent, counsel moved to strike out the whole testimony of the witnesses.  A favorable ruling on the motion would have carried out with the objectionable answers much testimony that was competent.  The court could not without error sustain the motion.  It should have embraced and distinctly pointed out those answers which were erroneous.  The evidence then being properly in, some of it competent to sustain one theory of plaintiff, and some the other, the court merely read to the jury that part of the opinion of this court on the former appeal in which we decided what should be the measure of damages if the owners were compelled to change the character of the structure or to remove it, and what the measure if the only risk was that to which buildings are subjected by the ordinary and lawful running of locomotives. Defendant put four distinct points to the court for instructions on the measure of damages by fire, but in not one of them does it ask it to say to the jury, that if the danger to this warehouse was so imminent as to require a change of character of structure, or its removal, then the damage should be limited to the cost of such change or removal, which the testimony of all the witnesses showed would not exceed $200 or $300.  The court in general terms announced the correct rule; defendant was entitled on the evidence to more specific instruction in this particular, if it had been asked, but it was not asked, and we will not assume the court erred in omitting it.

On the whole case we see no error which would warrant a reversal.

The judgment is affirmed.